## RECONSTRUCTION FINANCE CORP. v. FOUST DISTILLING CO.

### No. 10782.

United States Court of Appeals
Third Circuit.

Argued Dec. 4, 1952.

Decided April 20, 1953.

344

Eugene Nogi, Scranton, Pa., William Hoffenberg, Baltimore, Md. (Nogi, O'Malley & Harris, Scranton, Pa., on the brief), for appellant.

Arthur J. Sullivan, Philadelphia, Pa. (David H. Frantz, Philadelphia, Pa., James G. McDonough, Scranton, Pa., on the brief), for appellee.

Before BIGGS, Chief Judge, and MARIS and HASTIE, Circuit Judges.

BIGGS, Chief Judge.

Reconstruction Finance Corporation (RFC), as transferee[1] of Defense Supplies Corporation (DSC), brought suit in the court below against Foust Distilling Company, a Pennsylvania corporation. The complaint contains two counts, asking (1) simple damages for breach of contract, and (2) treble damages under section 205(e) of the Emergency Price Control Act of 1942, 56 Stat. 23, as amended, 50 U.S.C.A.Appendix and Cumm.Supp. § 925(e), for violation of maximum price regulations and refund orders. Reasonable attorney's fees, interest and costs were also requested. The defendant moved to dismiss the complaint, and this motion was denied. See 87 F.Supp. 632. The defendant then filed an answer and counterclaim, and the plaintiff moved for summary judgment on the complaint, and to dismiss the counterclaim or alternatively for summary judgment thereon. See FRCP, 28 U.S.C.A., rules 56(a), 12(b) and 56(b). The record consisted of the complaint, to which were attached the contract between the defendant and DSC and the applicable price orders, the answer and counterclaim, and the plaintiff's supporting affidavits and defendant's counter affidavit.

The facts as they appear from the pleadings are as follows: On January 1, 1944, Foust entered into a contract with DSC. An amendatory agreement was entered into on July 1, 1944, but the amendments are not pertinent here. The January agreement provided that Foust was to sell and DSC was to buy ethyl alcohol in accordance with the appropriate regulations of the Office of Price Administration. It was also provided that pending determination of the maximum price by the OPA, DSC would make pro forma payments to Foust for the alcohol sold and delivered. If, subsequently, downward price adjustments were made by OPA Foust would refund to DSC. Alcohol was sold by Foust under this arrangement to DSC. The OPA then fixed maximum prices and, *inter alia,* made two price orders, one of April 18, 1947, the other of January 8, 1947, pricing at lower figures alcohol payment for which had already been received by Foust. The details of the ac-

1. By joint resolution of Congress, June 30, 1945, 59 Stat. 310.

counting are set out in notes 5, 6 and 7 to the opinion of the court below. See 103 F. Supp. at pages 170–171. The orders referred to specifically ordered Foust to refund to DSC the difference between the amounts paid by DSC to Foust and those set by the Administrator for the alcohol purchased and delivered to DSC substantially two years before.

The court below made no specific findings of fact (since it entered summary judgment) as to the use to which the alcohol purchased by DSC from Foust was put but relied on two separate affidavits of officers of DSC, somewhat conflicting, the first stating that 75% of the alcohol was transferred—in 1944 and 1945, years with which we are not concerned—at DSC's cost to the Army and Navy, 25% being sold at OPA ceiling prices for essential civilian use. The other affidavit states that all of the alcohol with which we are concerned was stockpiled by DSC.

The court below granted summary judgment on the complaint, awarding simple damages for breach of contract and treble damages under section 205(e) of the Emergency Price Control Act, for those claims not barred by the one year statute of limitations imposed by that section, together with interest and costs. Summary judgment in favor of the plaintiff was also given on defendant's counterclaim, and the plaintiff's counsel was allowed five thousand dollars as a fee. See 103 F.Supp. 167. Only the issue of treble damages and counsel fee are involved in the instant appeal by defendant.

The defendant has narrowed the issues on appeal. It does not challenge the action of the court below in granting summary judgment on its counterclaim and in refusing to credit its defenses of estoppel and laches. It further concedes that RFC is the lawful transferee of DSC, possessed of all the rights formerly accruing to DSC against the defendant. The defendant admits that among these rights is the claim for simple damages for breach of contract stated in count one of the complaint, and it offers no defense to this claim. The defendant seems to have abandoned in this court the defense, asserted by it to both counts in the court below, viz., that the price orders, issued by the Office of Price Administration, revising downward the defendant's prices for ethyl alcohol produced under the contract, were invalid and unenforceable. The defendant rests its case in this court on three propositions: (1) that RFC is not the proper party plaintiff in a suit against the defendant for treble damages under section 205(e) of the Emergency Price Control Act; (2) that treble damages under that section should not have been awarded on the pleadings without giving the defendant an opportunity to prove that any violation by it was neither willful nor the result of failure to take practicable precautions; and (3) that the court below should have authorized the filing of an amended answer. In the view we take of this case the last two contentions need not be considered.

Section 205(e) provides: "If any person selling a commodity violates a regulation, order, or price schedule prescribing a maximum price or maximum prices, the person who buys such commodity for use or consumption other than in the course of trade or business may, within one year from the date of the occurrence of the violation, except as hereinafter provided, bring an action against the seller on account of the overcharge. In such action [under this subsection], the seller shall be liable for reasonable attorney's fees and costs as determined by the court, plus whichever of the following sums is the greater: (1) Such amount not more than three times the amount of the overcharge, or the overcharges, upon which the action is based as the court in its discretion may determine, or (2) an amount not less than $25 nor more than $50, as the court in its discretion may determine: Provided, however, That such amount shall be the amount of the overcharge or overcharges * * * if the defendant proves that the violation of the regulation, order, or price schedule in question was neither wilfull nor the result of failure to take practicable precautions against the occurrence of the violation." Section 205(e) goes on to state that where the buyer is not entitled to

bring action against a violator, the Price Administrator may do so.

Both parties and the court below considered that the determination of this case must turn on whether DSC, an instrumentality of the United States Government, purchased ethyl alcohol from defendant "for use or consumption other than in the course of trade or business". The defendant contends that DSC's activities related to the use and distribution of the alcohol clearly amounted to "trade or business". The plaintiff contends DSC's activities were not "trade or business" within the intendment of the statute but were mere governmental functions. The District Court agreed with plaintiff, and held that RFC could maintain its action. After an examination of the legislative history, language and judicial construction of the statute we have reached another conclusion.

The control bill passed by the House of Representatives outlined the authority of the Price Administrator and the procedures for establishing, and protesting, maximum prices, but enforcement was limited to criminal prosecutions and suits by the Administrator to enjoin violations of his regulations and orders. See H.R. Report No. 1409, 77th Cong., 1st Sess. The Senate amended the House bill and these amendments reflect concern for the effectiveness of the legislation. Reciting the evils of steadily rising prices, the Senate Report stated, "These prospects the committee cannot face with equanimity. We must make adequate provision to prevent their occurrence. Accordingly, in amending the House bill, the committee has sought to strengthen it." Senate Report No. 931, 77th Cong., 2d Sess., p. 3.

With this purpose in mind the Senate committee proposed (1) amending section 4(a) of the bill to make it unlawful not only to sell but also "in the course of trade or business to buy or receive" any commodity in violation of any regulation or order establishing a maximum price; (2) added

Section 205(e) giving any purchaser of a commodity "for use or consumption other than in the course of trade or business" a right to sue the seller who violated a maximum price regulation or order; and (3) added Section 205(f) authorizing licensing under certain circumstances of sellers subject to price regulations or orders.

In explaining the addition of section 205(e) the Senate Report stated: "To discourage initial violations, the committee substitute provides for actions at law to recover $50 or three times the amount of the illegal overcharges.[2] This will permit *private* purchasers who buy for *personal* use or consumption, rather than in the course of trade or business, to protect themselves against violations of the act. * * * (b) Actions to recover damages. —Such actions have proved valuable * * both to relieve the Government of a part of the burden of enforcement and to deter initial violations. They afford a remedy at law to persons damaged by having had to pay unlawfully high prices. An action of this sort may be brought by any person who buys for use or consumption other than in the course of trade or business, to recover from the seller who violates a price regulation, or price schedule, damages in the sum of $50 or treble the amount of the unlawful overcharge." (Emphasis added). Senate Report No. 931, supra, at pp. 8–10.

The Conference Report repeats the same thought: "The Senate amendment also contains a further provision, retained in the Conference Agreement, which permits a civil action by non-commercial consumers for treble the amount of any overcharge (or a minimum of $50) made by any seller of any commodity subject to a price ceiling. The operation of this provision, however, is postponed until 6 months after the effective date of the bill." H.R. Report No. 1658, 77th Cong., 2d Sess., pp. 26–7; Congressional Record, Vol. 88, Pt. 1, p. 664.

■ These reports, and the cases construing the section, reveal that the prin-

---

2. Section 205(e) was amended in 1944 to give the court discretion to award as little as $25 so long as this sum should exceed the amount of the overcharges. See 58 Stat. 640.

cipal purposes of section 205.(e) were three in number: (1) to discourage initial violations. See Porter v. Crawford & Doherty Foundry Co., 9 Cir., 154 F.2d 431, certiorari denied 1946, 329 U.S. 720, 67 S.Ct. 53, 91 L.Ed. 624; Bowles v. Farmers Nat. Bank of Lebanon, Ky., 6 Cir., 1945, 147 F.2d 425; Bowles v. Major, 1945, 301 Ky. 604, 191 S.W.2d 926; (2) to assist the United States in enforcing the statute. See Bowles v. Farmers Nat. Bank of Lebanon, Ky., supra; Bowles v. American Stores, 1943, 78 U.S.App.D.C. 238, 139 F.2d 377; certiorari denied 1944, 322 U.S. 730, 64 S.Ct. 947, 88 L.Ed. 1565; Bowles v. Weitz, D.C.W.D.Pa.1946, 64 F.Supp. 829; and (3) to protect certain buyers, but not others, against loss from illegal overcharges. See Bowles v. Farmers Nat. Bank of Lebanon, Ky., supra; Bowles v. Trowbridge, D.C.N.D.Cal.1945, 60 F.Supp. 48. It will be noted that the factor of deterrence in section 205(e) was designed to operate upon both sellers and certain buyers. Sellers' violations were to be discouraged by the possibility of having to pay treble damages. Buyers, who under section 4(a) could also be violators if in trade or business, were denied the right to collect any overcharges from their sellers.

. The legislative history does not spell out the reasons for treating "trade or business" buyers under Sections 4(a) and 205 (e) differently from other buyers. But these reasons are not difficult to surmise. "Buyers engaged in commercial activity for profit" can be expected to know the price regulations applicable to their businesses and must therefore be deemed in pari delicto with their suppliers who violate those regulations. See Bowles v. Glick Bros. Lumber Co., 9 Cir., 1945, 146 F.2d 566; Bowles v. Googins, 2 Pike and Fischer, Price Control Opinions and Decisions 2049 (3rd Dist. Utah 1944). To provide otherwise would be dangerous, for buyers in business are often in a position to exert pressure on sellers to disregard price maximums. See Bowles v. Trullinger, 9 Cir., 1945, 152 F.2d 191, 192. It would be both inequitable and disruptive of business relations to permit business buyers to sue sellers for overcharges since such buyers are often in a position to pass on these overcharges, directly on resale of the commodities involved, or indirectly, to their customers.

■ Can DSC be described as a "private" purchaser who bought for "personal" use or consumption other than in the course of trade or business? We refer to the language used in Senate Report No. 931 and quoted above. The word "private" means " * * * apart from the state, peculiar to an individual". See Webster's New Int. Dict. 2nd ed. DSC, a federal corporation, employed as an instrument by the United States in the war effort, can scarcely be considered to be a "private" purchaser. Assuredly, DSC did not buy alcohol for its "personal" use. The alcohol here was stockpiled by DSC, if we accept the testimony of the pertinent affidavit; that is to say, DSC stored the alcohol so that it could be used by the Army and Navy and perhaps also be employed for essential civilian use. Such uses seem far from those described in Senate Report No. 931.

■ In Bowles v. Heinel Motors, D.C., 59 F.Supp. 759, 761, affirmed by this court, 3 Cir., 149 F.2d 815, certiorari denied 1945, 326 U.S. 760, 66 S.Ct. 141, 90 L.Ed. 457, the United States District Court for the Eastern District of Pennsylvania construed Section 205(e) and held that the word "consumption" employed in the statute resulted "in practically limiting the class of buyers who can sue in their own right to purchasers of household articles, food, dress, luxuries, and the like." [59 F.Supp. 761.] This interpretation seems to us to be a sensible one.

■ The Conference Report, as we have indicated, emphasizes the fact that the civil action in the name of the buyer is to be brought by the small, the "non-commercial" consumer.

It can scarcely be fairly said that a commodity stockpiled is "consumed". A stockpiled commodity is in fact prepared or held for consumption and as Chief Judge Kirkpatrick indicated in Bowles v. Heinel Motors, supra, an horrendous task of construction is presented if the word "consumption" is to be deemed the equivalent of the word

"use". Moreover, the minimum of $50 referred to in the Conference Report and in the statute (later reduced to $25; see note 2, supra) seems to us to look to the small, private individual who actually consumes the commodity. True, the $50 is a minimum, and it may be argued that no maximum limitation is imposed by the statute, that the sky is the limit, but the whole tenor of the first part of section 205(e), as well as that of the Senate and House Reports heretofore referred to and quoted, seem to us to indicate that the suit authorized to be brought by the individual as distinguished from the Administrator, is intended for the protection of the small consumer who purchased goods or commodities, perhaps, over-the-counter, from the retailer.

Coming now to the phrase "other than in the course of trade or business", should we hold that DSC was not engaged in trade or business? We think it is clear that it was not operating for a profit or to make money for its sole stockholder, the United States, but we may take judicial notice, as could the court below, of the fact that DSC transacted hundreds, perhaps thousands, of transactions in alcohol. The position, as to the issue of a sovereign government doing business, advanced by the court in Provisional Government of French Republic v. Cabot, D.C.S.D.N.Y.1945, 59 F.Supp. 855, reversed in part, Bowles v. Cabot, 2 Cir., 1946, 153 F.2d 258, though entitled to great respect, we do not find persuasive, even if the facts of that case could not be distinguished from those at bar.[3] Assuredly, it is difficult to hold when DSC bought alcohol and sold it to other government agencies, or to private manufacturers, as its charter (Article "Third") clearly entitled it to do, that it was not engaged in business simply because it was not seeking or procuring a profit for its stockholder. It has been held generally that where a government corporation carries on a business in the usual fashion of private corporations it is to be treated much as if it were an ordinary business corporation and should enjoy no special

*locus standi* for the purposes of suit. It has been held that where a government corporation carries on a business, it is an entity separate from the United States. See by way of comparison and analogy, Bank of United States v. Planters' Bank of Georgia, 1824, 9 Wheat. 904, 906, 6 L.Ed. 244; Sloan Shipyards Corp. v. United States Shipping Board Emergency Fleet Corp., 1922, 258 U.S. 549, 565, 42 S.Ct. 386, 66 L.Ed. 762; Keifer & Keifer v. R. F. C., 1931, 306 U.S. 381, 388, 59 S.Ct. 516, 83 L.Ed. 784; Lilienthal and Marquis, "The Conduct of Business Enterprises by the Federal Government", 54 Harv.L.Rev. 545 (1941). True, DSC was engaged in a government function but that function was buying and disposing of alcohol. We are not prepared to hold that DSC was *not* engaged in trade or business or, in the words of the statute, that it bought and sold alcohol *other* than in trade or business. Insofar as the Act which we are construing is concerned we can perceive no sound basis for distinction between the operation of DSC and those of private corporations who furnish or sell alcohols.

Examining the whole statute, its legislative history and in particular the provisions of sections 205(e) and 4(a), we think we can discern a dividing line, intended by Congress, to separate suits to be brought by the consumer from suits to be brought by the Price Administrator.

We are of the opinion that the dividing line set out by the statute between suits to be brought by the consumer and those to be maintained by the Administrator is as follows: If the consumer is one who was not likely to know price ceilings and by reason of this he purchased over the ceiling price, he was not in *pari delicto* with the seller and therefore could maintain the suit. As we have said, such a purchaser would usually be a private individual or citizen who purchased goods or commodities for family consumption. He was not engaged in business insofar as the purchase of the commodities was concerned. He purchased for

---

**3.** It has been many times alleged over the last twenty years that government has in fact frequently engaged in or become "big business".

"personal" use or consumption. If, on the other hand, the purchaser of the commodity purchased it for use in trade or business, he was one who should have known—was likely to and was to be expected to know—ceiling prices and he would have been in *pari delicto* with the seller. Under such circumstances the purchaser could or would hardly be expected to bring suit for the recovery of an over-ceiling charge made to him and Congress therefore saw fit to put a cause of action for treble damages on behalf of the United States in the Price Administrator. Otherwise the enforcement of a very important phase of the price-control law would come to naught. The business or trade purchaser would not be a "private" purchaser who bought for "personal" use but would be engaged in trade or business. We do not say, of course, that DSC or any other government corporation would be in *pari delicto* with the seller of a commodity at an over-the-ceiling price but surely it must be admitted that DSC was in a position to know as well and as soon as Foust what the ceiling prices would ultimately be. DSC was no small consumer but a large and active corporation created to buy and sell alcohol and to stabilize the market throughout the United States.

Moreover, the Price Administrator seems the logical person to bring suits for treble damages on behalf of the United States, when the recovery is for the benefit of the United States, as is implied by the statement in Porter v. Warner Holding Co., 1946, 328 U.S. 395, 401–402, 66 S.Ct. 1086, 1091, 90 L.Ed. 1332, referring to Section 205(e): "It [Section 205(e)] establishes the sole means whereby individuals may assert their private right to damages and whereby the Administrator on behalf of the United States may seek damages in the nature of penalties." While the Supreme Court was there contrasting the possibility of collecting damages in proceedings in equity under section 205(a), as compared with collection under section 205(e), we find the phrases used suggestive of the result which we should reach here.[4]

We hold, therefore, that RFC does not possess the capacity to maintain the instant suit.

In this part of our opinion we have taken the position most favorable to RFC and have treated the case as if there had been violations of an actual existing price order at the time the commodities were sold by Foust to DSC, delivered to and paid for by DSC. This was not the case for the refund orders were made approximately two years *after* the commodities were sold and delivered.

## II

In view of the importance of the principle involved, which may reach the reviewing Court, we think we should proceed to discuss whether the orders of the Price Administrator directed to Foust fall within the purview of section 205(e). This question may be put as follows.

Was the section also intended to impose treble damages where (1) no maximum price had yet been established, (2) a seller then making deliveries to a buyer, DSC, in exchange for pro forma payments, and, later, (3) an adjusted price being set by the Office of Price Administration necessitating refunds from the seller to the buyer, and, finally, (4), the seller refusing to make the price adjustment? Can the buyer then maintain a suit for three times the refunds?

We are led to the conclusion that section 205(e) was not framed to apply to the situation presented by the refund orders. There is no case relied on in either brief where the sequence of events leading up to a buyer's suit under the section was other than that to which the section clearly applies.[5] We do not base our decision,

4. Though the argument advanced in this paragraph may appear on first examination to be inconsistent with the statement heretofore made in this opinion that "It has been held that where a government corporation carries on a business, it is an entity separate from the United States", the inconsistency is more apparent than real for if DSC was engaged "in trade or business" the Administrator, or his successor, was the proper person to have brought the suit at bar.

5. There is a line of cases holding that orders prescribing maximum rents retro-

viz., that the statute will not permit the action to be maintained either by DSC or by the Administrator or his successor,[6] solely on our view as to the purposes of section 205(e), although these purposes necessarily serve as our guide in interpreting the section. The language of this and other sections of the statute supports our interpretation. The first clause of section 205(e) states "If any person *selling* a commodity *violates,* * * *." (Emphasis added.) We suggest that the sale and the violation are intended to occur at the same time, viz., at the time of the sale, not months later when a retroactive price order is promulgated. This interpretation is strengthened by the language of the Conference Report which talks of actions for three times any overcharges "made by any seller * * * *subject* to a price ceiling." (Emphasis added.) We think this means "subject at the time of the overcharge." It will be noted that the court below, in applying the statute of limitations to the various claims of RFC, found that Foust's violations occurred, neither at the time of the pro forma payments *nor* at the time the price orders were issued, but at the time defendant refused to refund excessive payments. We agree with this approach, but we think it aids our conclusion that section 205(e) does not apply in this case.[7]

We have already referred to the clause assuring the buyer a minimum recovery in his suit for three times an ovecharge, and to its significance. There is also the proviso which limits the buyer to the amount of the overcharge "if the defendant proves that the violation of the * * * price schedule * * * was neither willful nor the result of failure to take practicable precautions against the occurrence of the violation." What sort of precautions were intended? We think they were the study by vendors of existing price ceilings before making sales.[8] It is difficult to see how the disregard of a refund notice, when various methods of protesting the correctness of the amount to be refunded were available, could be anything but willful. We conclude therefore that the section of which this proviso is a part was not intended to apply to the situation before us.

Last, there is the 1946 amendment to section 205(e) [9] providing that the "Administrator may not institute any action under this subsection * * * if the violation arose out of the sale of a commodity to any agency of the Government * * * and such sale was made pursuant to the lowest bid made in response to an invitation for competitive bids." It seems that this amendment comes very close to stating that the kind of situation to which the section was intended to apply was where an existing price ceiling is violated at the time of a sale.

---

actively in accordance with the Emergency Price Control Act and the applicable rent regulations, and calling upon the landlords to refund excess rentals received, are orders "prescribing a maximum price" within the meaning of section 205(e). Woods v. Stone, 1948, 333 U.S. 472, 68 S.Ct. 624, 629, 92 L.Ed. 815; Rauer v. Wexler, 3 Cir., 1948, 167 F.2d 817; Creedon v. Babcock, 4 Cir., 1947, 163 F.2d 480. Woods v. Stone is discussed at a later point in this opinion.

6. Now the Attorney General, in the name of the United States. See the history set out in the first paragraph of Judge Lindley's opinion in Bowles v. Wilke, 7 Cir., 1949, 175 F.2d 35, 36.

7. The very word "overcharge" connotes a demand that the buyer pay a price which the seller knows to be excessive. In this case the pro forma payments were made on a basis which the seller thought proper, although subject to change. Moreover, "maximum price" describes a top limit, below which sellers may go at will. In this case, the price orders for ethyl alcohol, although labeled "maximum price" orders, were really nothing more than the application of a fixed price formula providing for costs plus four cents a gallon profit. There is therefore some doubt whether in this case the defendant violated a "maximum price order."

8. It should be noted that section 205(e) became effective six months after the other provisions of the act, presumably to allow time for price maximums to be established and for sellers to become familiar with them.

9. Act of July 25, 1946, 60 Stat. 676–7.

 There is also support for our view in section 4(a) of the statute. As already noted, section 4(a) makes it unlawful for a seller to sell or for a business buyer to buy any commodity in violation of a maximum price order. Sellers and buyers are mentioned together in this section, apparently in connection with a single transaction between them. In the situation in the instant case, however, it is not possible for the buyer to be at fault, even assuming the buyer to be in trade or business. Section 205(e) "is to be read in conjunction with § 4(a)." Bowles v. Glick Bros. Lumber Co., supra [146 F.2d 568]. Therefore we conclude that since section 4(a) cannot apply to the instant situation, section 205(e) does not.

The technique worked out between DSC and the defendant for determining the price of ethyl alcohol impresses us as a practical and necessary one under war conditions. But because of this technique and because the alcohol was sold directly to an instrumentality of the Government, the defendant's situation differed widely from those to which section 205(e) was directed.

 Our conclusion, therefore, is that neither RFC, as the successor to DSC, nor the Administrator, nor his successor, can maintain the instant suit. Section 205(e) was not intended to apply to refund orders under the circumstances at bar.

We must concede that Woods v. Stone, 333 U.S. 472, 477-478, 68 S.Ct. 624, 627, 92 L.Ed. 815, can be interpreted to require a conclusion contrary to that which we have reached here on this phase of the case. Mr. Justice Jackson's opinion held that a rent order, smacking of retroactivity, could sustain a claim for treble damages brought by the lessee; in other words, the lessor could be guilty of breach of a rent order not in existence at the time the property was leased to the lessee and money for the rent paid. In the Stone case, Mr. Justice Jackson stated, "It is also suggested that the refund order applies the law to the landlord retroactively. Quite apart from the fact that this is an objection to the order itself rather than to the question of limitation of time, we think the suggestion to be without merit. This is not the case of a new law reaching backwards to make payments illegal that were free of infirmity when made. By legislation and regulation in force before the collections were made, the landlord's own default in registering had rendered these payments conditional, subject to revision and to refund. Readjustment under these conditions cannot be said to be retroactive law making."

We emphasize the fact that payments when made by Foust to DSC were *legal* and were *free of infirmity when made*. Contrast the situation in the Stone case where Stone failed to register his property as required by the Emergency Price Control Act of 1942 as amended, and the pertinent regulations. See notes 1 and 2 cited to the text by Mr. Justice Jackson, 333 U.S. at page 473, 68 S.Ct. at page 625. Stone acted in defiance of the Act and the Regulations. Foust did not. The payments made to Foust and the charges made by Foust were legal when made. They were made pursuant to the agreements referred to in the second paragraph of this opinion. The original contract required Foust to refund when the OPA had determined the ceiling prices for the alcohol. Foust refused to make the refund and thereby breached, not an Act of Congress, the Emergency Price Control Act, but its contract. The action here sounds in contract,[10] not in tort. The action really is one for breach of contract. RFC has recovered on that action. In our opinion it cannot recover treble damages which could only be awarded, by the very terms of section 205(e), for breach of the provisions of that section. Foust has not in fact or law committed any breach of the section.

In our opinion the Stone case does not require a contrary conclusion. The situation presented by the facts in the instant

---

10. The contract did provide that price adjustments, *when made*, should be made in accordance with applicable price regulations, but Foust's transgressions remain those of breach of contract rather than those of breach of existing law or existing regulations.

case was not "in focus" in the Stone opinion.

Judge Hastie concurs for the reasons stated in Part II of the opinion.

That portion of the judgment of the court below based on treble damages will be reversed and the case will be remanded with the direction to enter judgment in favor of Foust. The allowance of the counsel fee will, of course, fall with that part of the judgment which will be reversed.